IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ASHLEY SCOGGIN,<br><br>                             Plaintiff,<br><br>vs.<br><br>KEITH ZIMMER, in his individual capacity,<br>and MEAGAN COUNLEY, in her<br>individual capacity,<br><br>                             Defendants. | Case No. 4:26-cv-3053<br><br><br>**COMPLAINT, JURY DEMAND AND<br>DESIGNATION OF PLACE OF TRIAL** |

Ashley Scoggin, Plaintiff in the above-captioned matter, by and through her counsel of record, for her cause of action against Defendants, alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1.

This case is brought to redress a hostile educational environment, pursuant to 42 U.S.C. § 1983. It arises from the maladministration, by a deputy administrator of the University of Nebraska Department of Athletics, of a report of a potential sexual relationship between the associate head coach under his supervision and one of the players on that coach's team, and the accompanying accusations that the player had committed misconduct so severe to warrant removal from the team.

2.

Ashley Scoggin is a citizen and resident of Dallas, Oregon and Las Vegas, Nevada. At all relevant times, she was a student of the University of Nebraska-Lincoln, residing in Lincoln, Nebraska.

3.

Keith Zimmer is a citizen and resident of Lincoln, Nebraska; he is and was at all relevant times the sport administrator assigned to the University of Nebraska Cornhusker women's basketball team. Meagan Counley is also a citizen and resident of Lincoln, Nebraska; she is and was at all relevant times the Title IX Coordinator of the University of Nebraska. Their actions relating to this matter were within the course and scope of his employment, and were under color of state law.

4.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. The events at issue transpired in Lincoln, Nebraska and under the supervision of Defendant where the University of Nebraska Cornhusker women's basketball team traveled as part of its official schedule and service to the University of Nebraska. Venue is proper in this Court.

## FACTUAL BACKGROUND

### THE CORNHUSKER WOMEN'S BASKETBALL TEAM

5.

In 2021-22, the Head Coach of the University of Nebraska Cornhusker women's basketball team was Amy Williams; its associate head coach was Chuck Love. Williams and Love had coached together since 2012, when the University of South Dakota hired Williams as its head coach and Williams hired Love as one of her assistants. Before 2012, they had been professional colleagues at Rogers State University, where Williams was head coach for the women's basketball team and Love was an assistant coach for the men's basketball team. NU hired Williams as head coach of the Cornhusker women's basketball team in 2016. She brought Love to Nebraska as an assistant on her coaching staff.

6.

In 2021, ZIMMER had worked for the University of Nebraska Department of Athletics for over 30 years, in different roles. He was, at that time, a deputy sport administrator, working under the supervision of Director of Athletics Trev Alberts.

7.

Although Williams reported directly to the Director of Athletics, ZIMMER was the designee of the Director of Athletics to being in charge of the sports assigned to him. The Director of Athletics appointed ZIMMER to be in that capacity.

8.

ZIMMER was responsible to know, understand and communicate Department of Athletics internal policies to the persons involved with the sport assigned to him.

9.

ZIMMER was also responsible to know, understand and communicate training from the Title IX Coordinator to the persons involved with the sport assigned to him.

10.

ZIMMER knew, and agreed, that there are never any circumstances in which coaches should be allowed to have sex with their players.

11.

ZIMMER knew, and agreed, that the inherent power differential in coaches' relationships with student-athletes can give rise to actual or perceived conflicts of interest as well as claims of abuse of authority, exploitation, bias or favoritism.

12.

ZIMMER knew, and agreed, that similar concerns can arise when University employees

become involved in a sexual relationship, if one party to the relationship has supervisory or evaluative authority over the other; and he understood that this applies to coaches and student-athletes.

## THE CONDUCT POLICY

### 13.

ZIMMER was familiar with an internal policy of the Department of Athletics entitled "University of Nebraska Department of Athletics Student-Athlete Conduct Policy" (hereinafter "Conduct Policy"). ZIMMER knew that the Conduct Policy provides procedures for instances in which a student-athlete is alleged to have committed serious nonacademic misconduct.

### 14.

The purposes of the Conduct Policy include, *inter alia*:

To treat student-athletes fairly and provide procedures that will develop the facts to the point that actions taken under this policy are based on sufficiently credible information.

To assure confidence in the integrity of the process by minimizing the potential for conflict of interest on the part of administrators, coaches and student-athletes.

### 15.

The Conduct Policy applies "when a student-athlete has been alleged to have committed, charged with, or arrested for serious nonacademic misconduct," to include "[c]onduct that undermines or puts at risk the integrity and reputation of the University" and "[r]epeated acts of misconduct, different than the aforementioned examples of misconduct, that raise the concerns addressed by this policy."

### 16.

The Conduct Policy further explains that "[t]he increased public attention that tends to

focus on allegations of misconduct by student-athletes requires a process that will be fair to the student-athlete and responsive to legitimate public concerns. … [The Conduct Policy] also emphasizes the importance of treating student-athletes fairly; a purpose which is best advanced when there are appropriate procedures to develop the facts that are the basis for disciplinary action."

17.

If the Conduct Policy applies, it provides a procedure for a fair and neutral factual inquiry to determine whether the allegations of misconduct are true and, if so, what discipline, if any, is appropriate.

18.

The Conduct Policy does not provide for fact-finding by the head coach or teammates.

19.

The Conduct Policy provides that at the direction of the Director of Athletics, the Executive Associate Athletics Director for Compliance or his designee shall promptly manage and inquire into the facts.

20.

The Conduct Policy does not provide for the head coach determining whether the allegations of misconduct are founded, unfounded, inconclusive, etcetera.

21.

As the Conduct Policy explains, "[t]he head coaches, mainly based on conflict of interest grounds, shall not be involved in the inquiry or decision making involving their teams relative to these matters and this policy."

22.

If the Conduct Policy applies, the Department of Athletics may, but need not, suspend the student-athlete pending factual inquiry, although the student-athlete's name will remain on the squad list during the factual inquiry. The Conduct Policy specifically provides that the head coach for the student-athlete does not make the suspension decision.

23.

Coaches do not determine whether the accusations against their student-athlete fall within the Conduct Policy. Rather, the Conduct Policy provides that "the Director of Athletics, shall, in good faith and using reasonable judgment, decide whether the policy applies," and that "the Director of Athletics is responsible for determining the Athletics Department's review and discipline of student-athletes for misconduct," by the greater weight of the evidence.

24.

When the Conduct Policy applies, a coach may not make the decision about what discipline and disposition is appropriate for her student-athlete. The Conduct Policy clarifies that the Director of Athletics shall make the decision about discipline and disposition. The Conduct Policy provides for a range of dispositional measures (from "apology" to "reprimand" to "dismissal from the athletic program").

25.

When the Director of Athletics has determined that the Conduct Policy applies, the student-athlete has the right to appeal the discipline and disposition," to include the right to retain counsel for the appeal. After the disposition and any appeal, should the student-athlete make the Director of Athletics aware of new information not considered in the original decision, they may, at their discretion, re-open the process, investigate the new information and may issue a revised

decision, which shall be subject to appeal in the same manner as the original decision.

## TITLE IX TRAINING

26.

As a 30-year-plus employee of the Department of Athletics, ZIMMER had received annual training from the University of Nebraska Title IX Coordinator, COUNLEY.

27.

This included training on what conduct constitutes sexual harassment.

28.

This also included training on how to respond upon receiving a report of possible sexual harassment.

29.

COUNLEY developed training and trained NU employees, including ZIMMER and Williams, that only the Office of Institutional Equity & Compliance should conduct investigations of reports of possible sexual harassment.

30.

COUNLEY developed training and trained NU employees, including ZIMMER and Williams, that NU employees should not conduct their own "investigation" before reporting to the Office of Institutional Equity & Compliance.

31.

COUNLEY developed training and trained NU employees, including ZIMMER and Williams, that upon receiving a report or disclosure, employees should let the person talk, but don't ask questions about the incident (except for assessing safety).

32.

COUNLEY developed training and trained employees of the Department of Athletics, including ZIMMER and Williams, that all known or suspected sexual misconduct matters must be immediately reported to the Office of Institutional Equity & Compliance, or to the Compliance section of the Department of Athletics (which would then make the report to the Office of Institutional Equity & Compliance); that the Office of Institutional Equity & Compliance will then investigate, and that no one else should initiate, conduct, involve or impede investigations of suspected sexual misconduct.

33.

The Title IX training that ZIMMER received also included training in a resolution passed in 2014 by the National Collegiate Athletics Association, stating that athletic administrators must cooperate with but not manage, direct, control or interfere with college or university investigations into allegations of sexual violence.

### ASHLEY SCOGGIN

34.

ASHLEY joined the Cornhusker women's basketball team in 2020. ASHLEY joined the team on an athletic scholarship as a redshirt sophomore guard with a special talent for three-point shooting. Her scholarship included tuition, access to trainers, access to a sports psychologist, medical care, a housing allowance, access to a nutritionist and the "training table" for meals, as well as other benefits.

35.

ASHLEY had a successful 2020-2021 season, and in 2021 was a finalist for the NCAA Division I Junior College Transfer of the Year. By February 2022, ASHLEY had had 51 consecutive

starts for the Cornhuskers. Her career three-point percentage ranked seventh at that time in Nebraska Cornhusker women's basketball history.

36.

The Nebraska women's basketball coaching staff, to include Williams and Love, knew that ASHLEY aspired to become a coach when her playing career was over.

37.

In the tightknit community of basketball coaches and players, reputation matters. A positive reputation among other coaches will help a coach or player to advance their career; a negative reputation can impact a coach or player's ability to work and build their career in basketball.

### CHUCK LOVE'S SEXUAL RELATIONSHIP WITH ASHLEY

38.

Beginning in September 2021, Associate Coach Chuck Love engaged ASHLEY in a sexual relationship – a relationship Love has now admitted to.

39.

Love directed ASHLEY, repeatedly, to never tell anyone about the relationship.

40.

Williams knew that Love and ASHLEY spent unusual amounts of time together. She had personally seen it, although she had not made inquiries of either Love or ASHLEY about what was happening. Williams had not implemented any rules, policies or procedures to protect boundaries between her players and Department of Athletics staff, including coaching staff. She had neither given nor requested training to her players on appropriate boundaries, thus creating the impression for her players that contact from coaches on non-basketball matters was acceptable, even if late at

night or on private and personal matters.

41.

Other players on the women's basketball team suspected that the relationship between Love and ASHLEY was inappropriate. They noticed the time Love spent with ASHLEY. They questioned whether that Love used his influence with Williams to give ASHLEY more playing time.

42.

ASHLEY believed, correctly, that others were aware of something inappropriate going on between her and Love. She did not know how to stop the situation. She continued to fear that Williams would blame her for initiating this relationship. She feared that Williams would retaliate against her.

**FEBRUARY 16-17, 2022: THE SEXUAL RELATIONSHIP IS REVEALED**

43.

The Cornhusker women's basketball team traveled to State College, Pennsylvania to play Penn State on February 17, 2022. ZIMMER did not travel with the team.

44.

On the night before the game, members of the team and a paid student manager planned and carried out an elaborate caper (hereinafter "The Caper") to confirm and record on video ASHLEY's presence in Love's hotel room. The team members believed that it was critical to obtain video evidence because, without it, Williams would not take any action. The Caper included:

- One player claiming she needed to talk to Love about a personal matter, as a ruse to get Love to leave his room at a time when the team believed ASHLEY was in his room;
- The student manager deceiving a front desk clerk in order to obtain a key to

Love's room for the purpose of The Caper;

- When the student manager opened the door to Love's room with the room key, two other team members entered the room with a cell phone video recorder running;
- Two more team members were watching The Caper on FaceTime, in real time.

45.

ASHLEY was ashamed, afraid, humiliated and paralyzed in fear of what would happen. Since Love had first made advances toward her, ASHLEY had feared that reporting Love's behavior would harm her even worse than the harm of Love's behavior. She feared that she would be disbelieved, blamed or both. She feared that her career would be functionally over, as in reduction in playing time, ostracization, etcetera, if she reported Love's behavior. When The Caper happened, everything ASHLEY had feared was quickly manifesting.

46.

ASHLEY had no one to counsel her or to advocate for her. She was afraid of what would happen if she disclosed the sexual relationship; she was afraid of what would happen if she did not disclose it.

47.

Within an hour of The Caper, the rest of the players and all of the coaching staff except Williams, as well as at least one trainer, the Director of Basketball Operations and the Video/Content Coordinator, knew of The Caper. They decided to not awaken Williams.

48.

Williams learned of The Caper early the next morning, not from her assistant coaches but from the team captains. The captains went to Williams' hotel room, told her of the caper and showed her the video.

WILLIAMS INVESTIGATES, AND CONTAMINATES THE EVIDENCE

49.

Williams did not follow her training to immediately report the suspected sexual misconduct to the Office of Institutional Equity & Compliance.

50.

Instead, Williams conducted her own investigation, at first on her own by questioning ASHLEY. Williams did not notify ASHLEY of her rights under either Title IX or the Conduct Policy.

51.

Williams also took no steps to ensure ASHLEY's physical or emotional safety.

52.

ASHLEY thus was afraid to disclose to Williams that Love had initiated a sexual relationship with her. She denied the sexual relationship at that time.

53.

Thereafter, Williams continued her investigation with the active assistance of the team, by convening a confrontational inquiry of ASHLEY and Love with all members of the team present, along with the coaching staff and the student manager who participated in The Caper. The inquiry, which lasted between two and three hours, was emotionally charged. Those present demanded that ASHLEY explain why she was in Love's room (and had been out of her hotel room on previous road trips) and accused ASHLEY of lying.

54.

ASHLEY was, in fact, still lying during the inquiry. Love was a few feet away from her in the room, along with Williams and the rest of the coaching staff. Love had told her not to disclose

the relationship.  ASHLEY was afraid that if she did disclose it during the inquiry, her coaches and teammates would blame her:

- Blamed as an equal participant in the relationship as if her power were equal to that of the associate head coach;

- Blamed for somehow being the aggressor or seducer in initiating the relationship;

- Blamed for not reporting Love's early boundary violations immediately, when she did not appreciate those violations as grooming;

- Blamed for not reporting Love's first advance immediately, when she was afraid she would be disbelieved;

- Blamed for having a sexual relationship with a married father of four children;

- Blamed for getting playing time that her teammates may have felt she received only because of the relationship;

- Blamed for the impact on the team's success if Love were no longer able to coach and provide his typical contributions to recruiting, practices, scouting and game-planning, coaching during games, etcetera;

- Blamed for the impact on individual team members if Love were no longer able to provide team members with skill development, guidance for their post-college careers in athletics and connections to the "next level";

- And if she did disclose it, Love might continue to deny the sexual relationship and would call ASHLEY crazy and a liar, or might add to the blaming and shaming of ASHLEY.

During the inquiry, ASHLEY felt as if the world, and her entire future in athletics, was crashing down on her head.

55.

At the end of the inquiry, Williams suspended ASHLEY and Love.  By that time, ASHLEY still did not know that the Conduct Policy existed.  She still had not been advised of her rights under Title IX.

## ZIMMER BECOMES INVOLVED

### 56.

Williams notified ZIMMER of The Caper, and of her decision that ASHLEY would not play that night, via telephone at 4:30 p.m. on February 17, 2022.  This was before the Nebraska-Penn State basketball game was to begin.  She had not reported The Caper to anyone else yet.

### 57.

From Williams' description of The Caper and what followed, ZIMMER learned that Williams had violated her training to report, and to not investigate.

### 58.

ZIMMER learned that during the inquiry, ASHLEY had been pressed to show any verification of the alleged meetings with past-teammates that would explain her leaving her room on road trips, but that ASHLEY could not produce names, texts, emails, etcetera.  Williams told ZIMMER that the conclusion in the inquiry was that ASHLEY's late night visits with Love were ongoing.

### 59.

In the same call, Williams advised ZIMMER of ASHLEY's "suicidal picture."

### 60.

ZIMMER knew that when there is a suspicion of harassment or discrimination, there is a critical moment that allows organizations to either handle an investigation appropriately or not appropriately.  This had been a matter of training from the Office of Institutional Equity & Compliance.

### 61.

ZIMMER knew that the report Williams had received on the morning of February 17, 2022

was a report of suspected sexual misconduct.

62.

ZIMMER knew that upon receiving that report, Williams had investigated (including convening, supervising and participating in the inquiry) instead of reporting.

63.

ZIMMER knew Williams' actions violated the training both of them had received to report suspected sexual misconduct immediately to Compliance.

64.

ZIMMER knew that neither Williams nor himself was trained in investigating suspected sexual misconduct by a coach toward a player.

65.

ZIMMER knew Williams, due to her position as head coach, had a conflict of interest that would compromise her ability to conduct a fair and equitable investigation of suspected sexual misconduct by a coach toward a player.

66.

ZIMMER also knew Williams' actions compromised the integrity of any investigation that the Office of Institutional Equity & Compliance could conduct.

67.

ZIMMER knew that Williams' actions had the potential to intimidate and/or chill ASHLEY from disclosing important facts.

68.

From his training, ZIMMER knew that there are a number of reasons why victims are often hesitant to report incidents of sexual violence or harassment.

69.

ZIMMER also knew from his training that in the Title IX context, report equals support –
meaning, that reporting is not just about compliance, but is about doing the right thing by creating
an environment free from sexual misconduct and gender-based discrimination.

70.

ZIMMER knew that ASHLEY was now being accused of misconduct that undermines or
puts at risk the integrity and reputation of the University, ranging from being under the covers in
the associate head coach's room late at night, to repeatedly being out of her room after alleged
curfew, to lying – misconduct so serious that Williams had already deemed that ASHLEY would
not play in the Penn State game, and so serious that it would likely lead to the removal of ASHLEY
from the team altogether.

71.

As the deputy administrator assigned to the women's basketball program, ZIMMER also
knew that ASHLEY had never been accused of misconduct (non-academic or otherwise) until she
was found under the covers in Love's room.

72.

In that call, Williams told ZIMMER that the staff and players refused to play if ASHLEY
were part of the team.  This was not accurate.

73.

Williams also told ZIMMER that she had placed ASHLEY in a private locker room during
the Penn State game.

74.

Upon receiving this report, ZIMMER took no measures to protect ASHLEY's

confidentiality or to advise ASHLEY of her rights, including her right to due process to protect her liberty interests.

76.

ZIMMER did not advise ASHLEY, or direct Williams to advise ASHLEY, of her rights under Title IX.

76.

ZIMMER did not advise ASHLEY, or direct Williams to advise ASHLEY, of her rights under the Conduct Policy.

77.

As a 30+-year employee of the Department of Athletics, ZIMMER knew that the sudden absence of the Associate Head Coach and a highly productive starting guard from the Nebraska-Penn State game would capture attention, and would lead quickly to speculation and rumors. ZIMMER took no steps to protect ASHLEY from the easily foreseeable attention that would result (and did result) from Williams' removal of ASHLEY and Love from the team shortly before the Penn State game.

78.

ZIMMER knew that rumors regarding Cornhusker athletes and coaches circulate in media coverage, on social media, on message boards, in online comments and related fora.  ZIMMER also knew that "the internet is forever."

79.

ZIMMER knew that speculation about the sudden absence of the Associate Head Coach and a highly productive starting guard from the Nebraska-Penn State game would include the speculation of a sexual relationship; and, he knew that such speculation could become crass, vulgar

and humiliating.  ZIMMER also knew that such speculation would permanently damage ASHLEY's career path to professional work in athletics.

80.

ZIMMER ratified Williams' decision to investigate instead of reporting to the Office of Institutional Equity & Compliance, in contravention of Title IX training to provide the student a fair and neutral investigation.  He ratified Williams' decision to create the visible absence, without explanation, of both ASHLEY and Love together from the Nebraska-Penn State game.

81.

From Williams' phone call forward, ZIMMER coordinated the communications that followed between the Department of Athletics and the Office of Institutional Equity & Compliance.

82.

On February 17, ZIMMER communicated with Director of Athletics Trev Alberts and Executive Associate Director for Compliance Jamie Vaughn.

83.

ZIMMER did not direct the attention of either Alberts or Vaughn to the existence of the Conduct Policy, nor to the fact that no one had advised ASHLEY that her rights under the Conduct Policy.

84.

ZIMMER did not direct the attention of either Alberts or Vaughn to the Title IX training to immediately report, and to not investigate.

85.

ZIMMER did not direct the attention of either Alberts or Vaughn to the certainty that

public attention to the visible absence of Love and ASHLEY from the Nebraska-Penn State game would generate crass, vulgar and humiliating commentary which would damage this student-athlete's professional future.

86.

Vaughn called COUNLEY and reported to her that "there was a situation reported to him involving a women's basketball athlete and coach," identifying ASHLEY and Love.  Vaughn advised COUNLEY that he learned of this from a team parent.  He told COUNLEY about The Caper, and he gave COUNLEY conflicting information about whether ASHLEY was clothed when team members entered Love's room to find her under the covers.

87.

Meanwhile, ZIMMER also called Associate Director of Athletic Communications Keith Mann, to begin working on a media release related to a likely continued suspension of Love "and this is a HR matter with no further comment."  He included no content for the media release relating to ASHLEY.

88.

ZIMMER prioritized the reputation and image of the Department of Athletics at the expense of the rights of the student-athlete, in spite of his knowledge that sexual relationships between coaches and student-athletes are prohibited by Board of Regents policies.

89.

ZIMMER prioritized the reputation and image of the Department of Athletics at the expense of the rights of the student-athlete, in spite of his knowledge that sexual relationships between coaches and student-athletes are the product of unequal power and *quid pro quo* sexual harassment.

90.

ZIMMER called COUNLEY at 8:15 p.m. on February 17. By that time, it had been nearly 4 hours since Williams advised him of The Caper and her investigation; 7 to 8 hours since ASHLEY was questioned at Williams' and the team's inquiry; and approximately 10 hours since Williams first questioned ASHLEY.

91.

In those actions and his delay in communicating with the Office of Institutional Equity & Compliance, ZIMMER ratified the actions of Williams in depriving ASHLEY of her right to procedural due process.

92.

In their 8:15 p.m. telephone conversation, ZIMMER told COUNLEY Williams' version of events. COUNLEY learned from ZIMMER that Williams had conducted her own investigation. She also learned of the inquiry, with participation of other team members and in Love's presence.

93.

COUNLEY knew that it was foreseeable that ASHLEY, in the aftermath of The Caper, ASHLEY would be feeling humiliation, shame and fear, and that she would be feeling unprotected.

94.

COUNLEY knew that for Williams to conduct her own investigation instead of reporting immediately to the Office of Institutional Equity and Compliance violated ASHLEY's right to a fair and neutral investigation.

95.

COUNLEY had no reason to believe that Williams had received any training in how to investigate potential sexual misconduct.

96.

COUNLEY knew that Williams had a conflict of interest that would prevent her from conducting a fair and neutral investigation. She knew that this conflict could impact how Williams approached her investigation. She knew that Williams' conflict could also impact ASHLEY's ability to participate in an interview by Williams.

97.

COUNLEY knew that an investigation can be contaminated by intimidation of the victim. She knew that victim intimidation can be a concern in cases involving potential sexual misconduct by a University employee.

98.

COUNLEY took zero steps to attempt to cure that potential contamination.

99.

COUNLEY did not ask for ASHLEY's phone number so that she or one of her investigators, as an ostensibly neutral and non-conflicted representative of the Office of Institutional Equity & Compliance, could reach out to ASHLEY.

100.

COUNLEY did not direct ZIMMER or Williams to cease their attempts to investigate.

101.

COUNLEY did not direct ZIMMER or Williams to cease their attempts to obtain information directly from ASHLEY.

102.

COUNLEY told ZIMMER that due to the "high profile nature" of the matter, she was going to ask University counsel whether this should be a Title IX investigation or otherwise.

103.

COUNLEY does not regularly confer with University counsel to determine whether a report of potential sexual misconduct should be a Title IX investigation or otherwise.

104.

COUNLEY knew that the regulations of Title IX do not change if a report of potential sexual misconduct has a "high-profile nature."

105.

COUNLEY knew that the rights of a student involved do not change if a report of potential sexual misconduct has a "high-profile nature."

106.

COUNLEY did not review any policies to determine whether this report of potential sexual misconduct should be a Title IX investigation or otherwise.

107.

The University policy on relationships between faculty and students does not contain language indicating its application is different if a report of potential violation of that policy is "high profile."

108.

COUNLEY did not review the University of Nebraska Executive Memorandum on Employee Sexual Misconduct to determine whether this report of potential sexual misconduct should be a Title IX investigation or otherwise.

109.

The University of Nebraska Executive Memorandum on Employee Sexual Misconduct does not contain language indicating its application is different if a report of potential sexual misconduct

is "high profile."

110.

At the time of her call with ZIMMER, COUNLEY knew there was reason for concern about ASHLEY's well-being.

111.

COUNLEY questioned ASHLEY's safety on the trip home.

112.

COUNLEY considered the potential issue of intimidation of ASHLEY on the flight home.

113.

The only step COUNLEY took for ASHLEY's physical and emotional safety was to suggest separation from Coach Love would likely be a wise proactive measure to eliminate potential issues.

**ZIMMER'S SUPPORT OF WILLIAMS CONTINUES, AT ASHLEY'S DIRECT EXPENSE**

114.

ASHLEY traveled back to Lincoln with the team, though without any offers of or actual support or advisements of her rights.

115.

The next morning (February 18, 2022), COUNLEY met with Associate to the Chancellor Marc Pearce and two members of University counsel.

116.

After that meeting, COUNLEY informed ZIMMER that "after consultation with legal counsel, with no confirmed sexual encounter, does not warrant Title IX investigation." By the time she made that decision, COUNLEY had made no effort to contact ASHLEY.

117.

COUNLEY knew that confirmation of a sexual encounter is not required in order to warrant a Title IX investigation.

118.

COUNLEY knew that it is common for victims to not disclose their abuse when they are asked about it.

119.

COUNLEY knew that it is common for victims of sexual misconduct to fear the consequences of disclosure.

120.

COUNLEY knew that it is common for victims of sexual misconduct to fear retaliation or blowback if they disclose.

121.

COUNLEY also knew that victims may even lie about the existence of a sexual relationship that they were groomed and pressured into, when they are upset and embarrassed and afraid.

122.

COUNLEY knew that it even if the victim of sexual misconduct does not file a formal Title IX complaint, she (as the Title IX Coordinator) is empowered to sign a Title IX Complaint and investigate.

123.

There was no legitimate reason for COUNLEY, as the Title IX Coordinator, to declare that the report of a potential sexual relationship between a coach and a player "does not warrant Title IX investigation."

124.

In that declaration, COUNLEY ratified the actions of Williams in violating the clear training of the Title IX coordinator to provide a fair and neutral investigation of reports of potential sexual misconduct.

125.

COUNLEY furthermore ratified the actions of Love in initiating a sexual relationship with ASHLEY, sending the message that the University of Nebraska Office of Institutional Equity & Compliance would stand down from investigating reports of potential sexual misconduct until and unless it receives a "confirmed sexual encounter."

126.

COUNLEY knew that ASHLEY needed support.

127.

COUNLEY told ZIMMER that even though there would be no Title IX investigation, she would like to meet with ASHLEY to offer support and resources.  She did not ask ZIMMER for ASHLEY's phone number.

128.

ZIMMER called ASHLEY after speaking with COUNLEY, to request that ASHLEY meet with COUNLEY "to learn of resources and support."  He still did not advise ASHLEY of any rights she had under Title IX and/or the Conduct Policy.

129.

At 11:25 a.m. on February 18, 2022, COUNLEY emailed ASHLEY.  In her email, she wrote:

I understand you do not want to meet me with, and I respect that.  I wanted to

provide you with some information about resources and support available to you. If you change your mind in the future and would like to discuss any of the information I've included below, please let me know, and I am happy to setup a time to speak with you or connect you with resources.

130.

In this email, COUNLEY identified the University of Nebraska Center for Care, Advocacy and Education as a resource, which is an office of the University whose mission is to help people who have experienced sexual misconduct and other crimes.  COUNLEY also offered supportive measures in this email to ASHLEY.  But she did not, in this email, advise ASHLEY of her rights as a potential victim of sexual misconduct.

131.

COUNLEY does not ordinarily offer to meet personally with each reported potential victim of sexual misconduct for whom her office does not open an investigation.

132.

ASHLEY did not see COUNLEY's email until much later.  She was emotionally wrung out, exhausted from arriving home from the Penn State trip at about 2:00 a.m., and too panicked to be making routine checks of her email.

133.

By the afternoon of February 18, 2022, Williams, ZIMMER and the Department of Athletics had already decided that ASHLEY would be removed from the team.

134.

Nebraska sports media did speculate on the sudden absence of both Love and ASHLEY from the Penn State game; and the media quickly learned that Williams had removed ASHLEY from the team and had, at the same time, suspended Love with pay.  The coverage spread to

national news outlets, message boards and social media. The humiliation and shaming for ASHLEY from the reporting of this non-coincidence of events has endured.

135.

On the afternoon of February 18, 2022, ZIMMER convened a meeting with Williams, ASHLEY and NU Department of Athletics Senior Women's Administrator Pat Logsdon. At that meeting, ZIMMER informed ASHLEY that because of "choices and decisions that she has acknowledged and conveyed to the team coupled with the no trust with the team, that we are considering removing you from the team, unless there is anything else you would like to say or offer to us at this time that could shed important information related to you and Coach Love."

136.

This meeting came after ASHLEY had spent the preceding 72 hours in the emotional upheaval of:

- Love summoning her to his hotel room for sex;

- followed by the shock, helplessness and humiliation of The Caper;

- followed the next day with being questioned by Williams;

- followed by the two-to-three-hour inquiry and confrontation by Williams and her teammates, in the presence of Love;

- followed by being placed alone by Williams in a private locker room during the Nebraska-Penn State game;

- followed by a late-night flight home with the same people who had questioned her for two to three hours in the inquiry;

- facing the potential end of her college career and serious damage to her professional dreams;

- with media and social medial speculation swirling; and

- overwhelmed by shame, humiliation and fear of what the next day could hold.

Nowhere in this sequence of events had ZIMMER, COUNLEY, Williams or any other official of the Department of Athletics informed her that she did, in fact, have rights. Nowhere in this sequence of events had ZIMMER or COUNLEY informed ASHLEY that for Love to have initiated a sexual relationship with her was an abuse of power and ethics, and a violation of ASHLEY's rights.

137.

ASHLEY had no advocate in the February 18 meeting with ZIMMER, Williams and Logsdon.

138.

The impact of the events of February 17, 2022 and the absence of support in this meeting was that on February 18, ASHLEY was too fearful and overwhelmed to disclose the sexual relationship.

139.

ZIMMER advised ASHLEY that "as a result moving forward the decision supported by University leadership was to not allow you to practice or play and permanently remove you from the Nebraska Women's Basketball roster."

140.

ZIMMER did not, in that meeting, advise ASHLEY that if the Associate Head Coach had pursued a sexual relationship with her, then that was an abuse of power and ethics and ASHLEY's rights under Title IX. The discussion was about how ASHLEY had lied and ruined the team unity – not about the underlying question of why a Nebraska coach had put ASHLEY in a position where she believed she had to lie.

141.

At the February 18, 2022 meeting, ZIMMER still did not advise ASHLEY of her rights, or of the existence of the Conduct Policy.

142.

ASHLEY advised her parents of her removal from the team. She was still afraid and ashamed to disclose Love's relationship with her, but she advised her parents that her removal was based on suspicion of a sexual relationship with Love. Her parents traveled from Oregon to Lincoln to accompany ASHLEY to a meeting on February 22, 2022 of Director of Athletics Trev Alberts, Williams, ZIMMER and Logsdon, one last chance to seek review of this decision by a higher authority.

143.

Neither in advance of nor at that February 22 meeting did ZIMMER advise ASHLEY of the Conduct Policy. ASHLEY was never given an opportunity to ask that Alberts make a good-faith determination of whether the Conduct Policy should apply, in light of the accusation of that ASHLEY had committed misconduct that undermined or put at risk the integrity and reputation of the University, whether that was being under the covers in the associate head coach's room late at night, to repeatedly being out of her room after alleged curfew, to lying.

144.

ZIMMER now admits that had ASHLEY disclosed the sexual relationship at this meeting, the whole direction would have changed. But both before and at the meeting, ZIMMER never told ASHLEY that Board of Regents policy prohibits coaches from having sexual relationships with undergraduate students and any student over whom they have evaluative or supervisory authority (regardless of the student's age). ZIMMER never acknowledged to ASHLEY that coaches must

never pursue sexual relationships with student-athletes.  He did not acknowledge to ASHLEY that for her to have been in Love's hotel room at all was the result of misconduct by Love.  ZIMMER never advised ASHLEY of her rights under Title IX to a fair and neutral investigation, or of the existence of the Conduct Policy.

145.

Given the pressure created by Love to not disclose the sexual relationship, compounded by the events that had begun with The Caper and were continuing as the meeting convened, it was not reasonable to expect that ASHLEY would suddenly now feel comfortable disclosing the sexual relationship with Love to Williams, ZIMMER, Alberts and Logsdon.

146.

Alberts endorsed Williams' claims that ASHLEY was removed for dishonesty, and ratified Williams' decision to remove from the women's basketball team.

147.

Since Williams first called ZIMMER at 4:30 p.m. on February 17, 2022, ZIMMER had had the ability, the authority and the power to mitigate the harm ASHLEY had already experienced as a result of Love's sexual misconduct.  Instead, ZIMMER made that harm worse, ratifying the actions of Williams, Alberts, COUNLEY and, for that matter, Love.

### THE DAMAGE DONE

148.

The Department of Athletics immediately removed ASHLEY from the roster of the women's basketball team.  Her image was removed from all promotional materials for NU, including videos played before and during games.  Love remained on the roster in spite of his paid suspension.

149.

The media attention of the simultaneous removal of ASHLEY from the team and suspension of Love persisted, including at post-game press conferences.  So did the coarse and vulgar speculation on social media, message boards and other online commentary.

150.

ZIMMER did not direct investigation or discipline for the paid student manager (a male student) who had obtained a key, under false pretenses, to Love's room from the hotel desk clerk in State College, Pennsylvania.

151.

ASHLEY eventually transferred to the University of Nevada-Las Vegas.

## FIRST CAUSE OF ACTION

## 42 U.S.C. § 1983 - ZIMMER

152.

In February 2022, ASHLEY had a protected property interest and protected liberty interest in her status as a member of the Cornhusker women's basketball team.  As a member of the team, ASHLEY received a tuition scholarship, housing assistance, academic support services, access to weight training, access to life skills training, access to the training table, access to sports medicine facilities, eligibility for Name, Image & Likeness income, access to professional coaching and mentoring for her development as a basketball player, and other benefits that have historically helped student-athletes succeed in life after their college careers end.

153.

ASHLEY's liberty interest also included the interest in her good name, reputation, honor, or integrity, and in avoiding a stigma or other disability foreclosing freedom to take advantage of

future professional opportunities.

### 154.

In February 2022, the University of Nebraska Department of Athletics Student-Athlete Conduct Policy was in full force and effect.

### 155.

Informed of The Caper, the inquiry that followed and Williams' placement of ASHLEY in a private locker room alone during the basketball game, ZIMMER ratified Williams' decision to investigate instead of report, in violation of ASHLEY's rights under the Conduct Policy.

### 156.

Informed of The Caper, the inquiry that followed and Williams' placement of ASHLEY in a private locker room alone during the basketball game, ZIMMER ratified Williams' decision to investigate instead of report, in violation of ASHLEY's rights under Title IX. In so doing, ZIMMER also ratified Love's decision to initiate a sexual relationship with an undergraduate student-athlete over whom he had supervisory and evaluative authority.

### 157.

ZIMMER allowed the damage caused by Williams' actions to the integrity of any investigation to persist and worsen. This includes the damage to ASHLEY, who after the events in State College, Pennsylvania was too afraid to disclose what ZIMMER now admits would have changed the outcome.

### 158.

In all of his communications with ASHLEY, ZIMMER left uncorrected ASHLEY's impression that she had no rights and no means of protecting her liberty and property interests.

159.

ZIMMER violated ASHLEY's right to procedural due process, to her damage.

160.

Had ZIMMER insisted that Williams followed the Title IX training and the Conduct Policy instead of allowing the events in State College to transpire as they did, that would have mitigated the lasting impact to ASHLEY of being questioned by her coach, interrogated and shamed by her teammates for hours with no advocate, and taken off the team in a manner that ZIMMER knew would damage her property and liberty interests.

161.

Had ZIMMER intervened to ASHLEY to advise her of her rights under the Conduct Policy and of the importance of allowing trained Title IX investigators to conduct a fair, neutral and equitable investigation, that would have mitigated the lasting impact to ASHLEY of being questioned by her coach, interrogated and shamed by her teammates for hours with no advocate, and taken off the team in a manner that ZIMMER knew would damage her property and liberty interests.

162.

Had ZIMMER followed the Conduct Policy instead of allowing these events to transpire as they did, ASHLEY would not have been removed from the Cornhusker women's basketball team.

**FIRST CAUSE OF ACTION**

**42 U.S.C. § 1983 - COUNLEY**

163.

Informed of the report of a sexual relationship, Williams' investigation and the inquiry that followed, COUNLEY ratified Williams' decision to investigate instead of report, in violation of

ASHLEY's rights under Title IX. She took no steps to cure the damage Williams caused to any possibility of a fair and neutral investigation.

164.

By determining that a Title IX investigation was not warranted -- even before communicating with ASHLEY-- because of "no confirmed sexual encounter," when she knew the events in State College had the potential to intimidate and shame ASHLEY out of disclosing the relationship, COUNLEY violated ASHLEY's right to a fair and neutral investigation.

165.

COUNLEY allowed the damage caused by Williams' actions to the integrity of any investigation to persist and worsen. This includes the damage to ASHLEY, who after the events in State College, Pennsylvania was too afraid to disclose that her coach had groomed and pressured her into a sexual relationship.

166.

In her email to ASHLEY, COUNLEY left uncorrected ASHLEY's impression that she had no rights and no means of protecting her liberty and property interests.

167.

COUNLEY violated ASHLEY's right to procedural due process, to her damage.

168.

Had ZIMMER insisted that Williams followed the Title IX training and the Conduct Policy instead of allowing the events in State College to transpire as they did, that would have mitigated the lasting impact to ASHLEY of being questioned by her coach, interrogated and shamed by her teammates for hours with no advocate, and removed from the team in a manner that ZIMMER knew would damage her property and liberty interests.

169.

Had COUNLEY intervened to ASHLEY to advise her of her right to a fair and neutral investigation, of the importance of allowing trained Title IX investigators to conduct a fair, neutral and equitable investigation and that University policy prohibited faculty from engaging in sexual relationships with undergraduate students, that would have mitigated the damage to ASHLEY's protected liberty and property interests.

170.

Had COUNLEY taken steps to cure the damage caused by Williams to ASHLEY's right to a fair and neutral investigation of the report of sexual misconduct, ASHLEY would not have been removed from the Cornhusker women's basketball team.

### DAMAGES

171.

ASHLEY did in fact suffer damage to her name, reputation, honor, or integrity, and her interest in avoiding a stigma or other disability foreclosing freedom to take advantage of future professional opportunities.

172.

The manner in which she was removed from the team, simultaneous with Love's paid suspension, made ASHLEY the butt of crude internet mockery. She received online threats and vulgar propositions on her social media accounts. The salacious association of ASHLEY and Love followed her as she sought to transfer to a different school to restart her playing career.

173.

ASHLEY lost her property interest in her participation on a Division I, Power 4 women's basketball team as well. This includes the difference in Name, Image and Likeness income that

ASHLEY could have received had she continued to play for the Cornhuskers for her remaining eligibility.

174.

In addition to compensatory damages, ASHLEY makes a claim for punitive damages against ZIMMER and COUNLEY available in an amount to be proven at trial for their willful and wanton acts and omissions, to include violation of her civil rights as alleged herein.  Defendants' acts and omissions were so culpable in nature that they constitute reckless indifference and wanton disregard for the law and for the safety of NU students, including ASHLEY.  Defendants' actions should be punished, and an example should be made so that these actions and omissions are not repeated.

175.

This instance of reckless and callous indifference to ASHLEY'S safety and constitutional rights should be punished through the imposition of punitive damages so as to make an example of conduct that will not be tolerated.

**ATTORNEY'S FEES**

176.

As a result of Defendants' actions as alleged herein, ASHLEY has been required to retain the services of attorneys and are entitled to a reasonable amount for attorney's fee pursuant to 42 U.S.C. § 1988 for those violations covered by the Civil Rights Act.

**PRAYER FOR DAMAGES**

177.

The acts and omissions of Defendants as set forth above have resulted in serious damage to ASHLEY.  ASHLEY thus seeks recovery for the following damages:

a.  Compensatory damages in an amount to be proven at trial, for ASHLEY's physical and mental pain and suffering, the loss of her place on the Cornhusker women's basketball team, inconvenience, stigma to her reputation, and expense -- all past and future;

b.  Compensatory damages for the violation of ASHLEY's rights under the federal and state Constitutions;

c.  Punitive damages to punish and deter the reprehensible conduct alleged in this Complaint;

d.  Attorney's fees; and

e.  The costs of this action and such other and further relief as this Court deems equitable and proper.

**WHEREFORE,** Plaintiff prays for judgment against the defendants as follows:

A.  Plaintiff prays for damages in an amount which will fairly and justly compensate for the violation of ASHLEY's civil rights, stigma to her reputation, her pain and suffering and other consequential damages flowing from the violations and torts set forth herein;

B.  Punitive damages in an amount sufficient to adequately punish defendants and to deter future conduct of the type alleged in this Complaint;

C.  For attorney's fees pursuant to 42 U.S.C. § 1988; and

D.  For the costs of this action and for such other and further relief as this Court deems equitable and proper.


## JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

ASHLEY requests that this matter be tried to a jury in Lincoln, Nebraska.

ASHLEY SCOGGIN, Plaintiff,


By: _/s/ Maren L. Chaloupka_
    Maren Lynn Chaloupka – NSBA #20864
    Chaloupka Law LLC
    1906 Broadway
    P.O. Box 1724
    Scottsbluff, NE  69363-1724
    (308) 270-5091
    mlc@chaloupkalaw.net

    -AND-

    Nathan J. Bruner – NSBA # 23629
    Bruner Frank Schumacher Husak Simpson
    5804 1st Avenue
    P.O. Box 2230
    Kearney, NE  68847
    (308) 455-1046
    nbruner@nebraskalawfirm.net